Case number 20-5174 Sevier County Schools Federal Credit Union et. al. v. Branch Banking and Trust Co Arguments not to exceed 15 minutes per side. Mr. Brown, you may proceed for the appellants. Thank you. May it please the court, I'm Gregory Brown of the Knox County, Tennessee Bar. And here on behalf of the appellants in our case, who are representatives of a putative class of customers, bank customers. And the question before the court is whether a huge national bank can take over a small local bank and impose on the customers of that bank arbitration requirements that were not agreed to between the customers and the local bank. And at the same time, you know, breach the agreement for the interest rate that would be paid to those customers. Is it your position that they may never require or never offer a contract for arbitration that banks may not know? No, Your Honor, absolutely not. Both this court and I believe the Federal Arbitration Act itself dictate that contract principles apply to arbitration agreements. And in this situation, the contract principles dictate that there was no agreement made between the customers and BB&T. OK, there were several arbitration provisions starting in 2001, continuing to 2017. The 2017, I think, is very clear, very upfront. Are you saying that even in 2017, that that was not a legitimate legal offer of contract, that that was somehow unclear, somehow not subject to understanding by the customers? I don't think the clarity of the language is at issue here, Your Honor. What's at issue is, first of all, that the appellants were entitled to a jury trial on the issue of contract formation that the court's asking about. Second, what is the genuine issue of fact as to the terms of particularly the 2017 contract? What would the jury decide there? First of all, there was no evidence offered to the court to show that that was actually sent or received. No admissible evidence was provided to the court on that issue. Second of all, it is a contract of adhesion. And under Tennessee law, which governs this relationship, this contract, contracts of adhesion are not enforceable if the terms are beyond the contemplation of the parties. And our arbitration in 2017 is not within the understanding of the. I mean, by that time, I think most banks had arbitration agreements. Did they not? The only evidence submitted to the court on this issue, Your Honor, was the affidavit Dwight Grisell, who is a banking expert from the Sevier County area, who said in his his affidavit said that by even by 17, there may have been a few banks in the county area that were using arbitration agreements, but it was still not widespread or common practice. That's the only evidence before the court on that issue. OK, well, it's your bird. It's your bird to get out of the contract, isn't it? I mean, if there's a lack of evidence, no, you're at this enforceable contract. Isn't isn't it your bird? Not not the banks? No, absolutely not. It is the bank's burden to prove that there is an arbitration agreement that was made between the parties. It's just the bank's burden of proof on that issue. And they have to sustain that burden with admissible evidence, which they did not do in this case. Aren't there a number of cases that say, though, that the continuous continuation of your account, once the bank, as I puts in an arbitration clause, shows assent to that, even if they didn't explicitly sign the agreement? Well, we have two issues here, one to address that point. The first is that the original agreement between the appellants and the local bank stated specifically how changes could be made to the terms of the agreement. They said that terms that changes in terms could be accomplished by posting in the bank. They would take effect 30 days after they were posted in the bank or by being included with bank statements. There's no evidence here. He has not sustained his burden to show that that was done. So the terms of the agreement that would allow for changes were not complied with. Would that be a matter for the arbitrator to decide? The arbitrator would decide the scope of the arbitration or the defenses to the arbitration. Wouldn't that be for arbitration rather than the court? No, Your Honor. Federal Arbitration Act? No? No, Your Honor. The initial question is one of your contract law that needs to be determined in the federal court, including the scope of arbitration. If there is an enforceable… Including the scope? I always thought scope was within the power of the arbitrator, not the court. I agree with you. If there is an enforceable arbitration agreement, which has to be determined by the court and the jury in this case, then the scope of what can be arbitrated can be determined by an arbitrator. But there's a threshold question concerning whether there is an enforceable agreement to arbitrate. Okay. Just to tell you, I think we do have a contract for arbitration here. Your argument is that there is a breach of the interest rate promise that the bank made in the 1990s. And your complaint, paragraph 5, says that the defendant breached the contract here by lowering the interest rate. Isn't breach of contract just a quintessential subject for arbitration? When you have a contract that provides for arbitration and there's a claim that there is a breach of a contract, isn't that really just a normal general subject for arbitration, particularly here when you're asking for damages? You're arguing that the lowering of the interest rate from 6% to 0.1% caused damages to you and your class. I mean, isn't that just a subject of arbitration? If there's an enforceable arbitration agreement. Okay, so you would agree that if the parties agreed to arbitrate, which I think they did, then the damage claim you have is subject to arbitration. I think that, yeah, if there is an enforceable arbitration agreement, then the claim for damages is possible. But your point is that this is a contract of adhesion and that it's unconscionable. That it's unconscionable that a contract of adhesion under Tennessee law is not enforceable unless where the terms are not, if they're beyond the expectations of a reasonable person and not reasonably within their contemplation. But you're arguing it's a contract of adhesion because it provides for arbitration, which is not within the contemplation of the parties, right? No, Your Honor, we're arguing that it's a contract of adhesion because if there was evidence that it was sent and received, it was a 33-page document, 22,000 words, not addressing terms. These are not terms that were within the original agreement. There was no dispute resolution clause in the agreement between the customers and the original bank. This was perhaps sent. There was no admissible evidence that it was sent. There was no admissible evidence that it was received by anybody. And you cannot merely send a document to customers and impose on them completely new terms under Tennessee law that were not within their contemplation and that were beyond their reasonable expectations. Okay, this all goes to the issue of whether there is an agreement to arbitrate, right? Yes, and contract principles applies. You have to have an offer that was actually delivered. Again, there's no admissible evidence here that it was ever sent or received. And you have to have acceptance. You have to have something else. Under Tennessee law, you cannot have acceptance by inaction unless estoppel principles apply. BB&T's argument is that this document was sent, again, no admissible evidence of that, that it was received, and that they had the opportunity to do something about it and did not. That is inaction. Under Tennessee law, that is you cannot create a contract that way unless you can find an affirmative duty on behalf of the recipient to respond, and you can show prejudice and reliance on the inaction. BB&T has not even attempted to show that. My understanding was that there was one stage, was there a contract? One could say, hypothetically, yes, there's a contract. But the second stage is, is it a contract of adhesion? And one could say, yes, it's a contract of adhesion, but it still could be valid and enforceable, unless third stage, it is unconscionable. Is that a proper analysis, those three different steps? Is it a contract? Is it a contract of adhesion? Is it unconscionable? Yes. And, yes, that's right. And we think there was no evidence, and it was a jury question on whether there was a contract. We think that if there was a contract, it was a contract of adhesion. It was oppressive to the customers. It limited the obligations and the liability of the stronger party, being BB&T. And, you know, if I could refer, if there were two decisions that I would really hope this court would focus on, it would be the Copeland case and the Berezinski case. And I'm aware that I only have 20 seconds left. I'd simply like to point out that in all of the cases that we've addressed, there were distinguishing features, where the customer signed, where it was set out on a separate page, where arbitration was clearly presented to them in a way that they could clearly accept. Let me ask you, what makes this particular contract oppressive? What is it in the arbitration agreement, if anything, that makes it oppressive? I would point out, Your Honor, that the right to a jury trial is a constitutional right. It's an important right that is inherent in our society, in our country, and the waiver of that is a critical issue. It needs to be done knowingly and not by inadvertently missing something buried in a 22,000- How many accounts are we talking about here? Do we even know? I notice your complaint says less than 100. Your Honor, I don't know the exact number. We never got to discovery on that. I believe it's, I don't know. I'm afraid to speculate. Do you know what the average balance is in each account? What is the range? Do you even have any idea of that? I mean, you've got some plaintiffs. Do they have 5,000 or 100,000 in these accounts? I think we have a range. I don't have the information in front of me, but between perhaps 10,000 and several hundred thousand. One of our clients is the credit union who is using this as an investment vehicle for the members of the credit union and their assets. So, there are large accounts involved also. Any further questions? Okay. Mr. Hicks. Thank you, Your Honor. May it please the Court, I'm John Hicks, and I represent BB&T in this case. I have several points that I hope to be able to address to the Court, including the admissibility and quantum of proof required mutual assent, adhesion and unconscionability and arbitrability. But before I do that, I'd like to address this notion that the arbitration agreement is somehow buried in reams and reams of paper that make it undiscernible to the customers here. The operative arbitration agreement, Judge Griffin, as you pointed out, is the 2017 document. And the uncontradicted proof from Mr. Powell, who is the vice president of BB&T, is that that amendment was sent to customers in a one-page document, the terms of which are set out and reproduced on pages 7 through 9 of our brief. And they specifically address and call to the attention of customers the existence of this arbitration agreement. And the notice goes on to say, specifically in a one-page notice, that continued use of the account after the effective date of this amendment constitutes your acceptance of the change. So there really is no real question about this idea that the arbitration agreement that is applicable to this dispute was somehow buried in a many multiple thousand word document that was not discernible to the ordinary consumer. It simply was. It was delivered in the context of a one-page notice that was without dispute. All right, Mr. Hicks. Okay, so if we look at 2017 as the operative time that arbitration was agreed to, they claim that there is a breach of the duty of the interest rate. And it's my understanding the breach occurred in 2018, I think. That's when your client reduced the interest rate from 6.5 to 1.05. Is that right? I believe that's correct, Your Honor. So that's 2018, not 2017. And then it's your argument that the alleged breach of the contract is subject to arbitration from the year before, where the agreement to arbitrate was entered into. Is that right? At a minimum, Your Honor, in 2017, the arbitration agreement was in place. Okay, they've agreed to arbitrate in 2017. They allege there's a breach in 2018. You argue that this breach and their claim for damages goes to the arbitrator. It doesn't go to court subject to the terms of the 2017 arbitration, right? That's exactly right, Your Honor. Okay, let me ask you this. I'm just curious. What basis did the bank have to suddenly, after 17 years, do away with the 6.5% interest rate on these accounts? By the very terms of the agreement, Your Honor. The bank services agreement that's applicable to this dispute specifically says that the bank can change the terms of the agreement. Yeah, but wait, that wasn't the original deal, though. The original deal was that we guarantee the rate will never fall below 6.5%. That's what the First National Bank of Gatlinburg did. Didn't you assume all their obligations? Well, Your Honor, that is the claim, but that is why we are before this court today. It is to determine what forum makes the decision and assesses damages, if applicable, for that breach of contract. I understand that point. Let me ask you this. I'm looking at the arbitration agreement, the 2017. Yes, Your Honor. It says the arbitrator may, in its award, allocate all or part of the costs of the arbitration, including the fees of the arbitrator and the reasonable attorney fees of the prevailing party. So I guess under that term, all that could be settled on the account holder, right? If they lost? Your Honor, that is correct. In fact, if they lost, then that is in the discretion of the arbitrator. But by the same token, the account holders who claimed this breach of contract had the same opportunity to recover those costs. In other words, the remedy is mutual here. It is not a one-sided arbitration agreement that gives any particular advantage to the bank. One of the primary considerations of this court in determining, as Judge Moore indicated earlier, in determining whether or not this arbitration agreement is effective, is to determine whether or not the terms, if in fact it is a contract of adhesion, which we don't believe it is for reasons I hope to get to discuss shortly, it can be nonetheless enforceable as long as it's not unconscionable. And here, if one reviews the terms of the arbitration provision here, the remedies are mutual. It would be far more oppressive on the account holder than on the bank if they have to bear the attorney fees of the bank and the arbitrator when they're disputing relatively low amounts. I mean, if you had a $10,000 account and earning 6.5% interest, that's $650 a year. And yet you could be saddled with thousands of dollars of costs under this arbitration agreement. Couldn't that be perceived as oppressive? I don't believe so, Your Honor. But even if it were, using Your Honor's example, the following sentence reads as follows. Notwithstanding other language in this agreement, a party retains the right to bring an action in small claims court if it is within the jurisdictional limits of that court. So under the example that Your Honor gave, the account holder could still bring an action in Tennessee in General Sessions Court for that small amount.  Your Honor, it varies from county in the larger counties to the smaller counties. I believe it is $10,000, Your Honor, but I can't represent that I know that 100%. Okay, so if we can use that outline that I was giving your opponent, we first decide, is there a contract? Suppose we decide there is a contract. Then we decide whether it's a contract of adhesion. And if we decide it's a contract of adhesion, then we decide, is it unconscionable? Is that the three-part test? Because if it's a contract of adhesion and unconscionable, then it is not a valid contract, and there would not be a valid contract for arbitration. I believe that analysis is correct, Your Honor, and we believe that the district court was correct in its determination that this is not a contract of adhesion, but that it is, in fact, one evidenced by mutual assent and one that the plaintiffs have not shown was a contract of adhesion. Let me ask you, Mr. Hicks, I can't believe that this is not a contract of adhesion. That just means basically take it or leave it. I mean, all sorts of consumer contracts are take-it-or-leave-it adhesion, but that doesn't make it illegal, but they are contracts of adhesion, aren't they? I mean, a landlord-tenant, if I wanted to rent an apartment, they're not going to let me negotiate the terms. I mean, there are all sorts of warranty agreements on products. All the pre-printed forms are everywhere. Now, how can you say this is not legal? Your Honor, I don't believe under Tennessee law that a pre-printed form that is offered on a take-it-or-leave-it basis is necessarily a contract of adhesion. But isn't this case different in the sense that the original contract was for a perpetual interest rate of 6% or 6.5%? And the contract in 2017 says the bank can change the interest rate at its will, and then the bank changes the interest rate to, I thought it was, 0.01%. I think that's correct, Your Honor, and that alleged breach of contract is exactly the dispute that is subject to arbitration. These individual plaintiffs have not lost their right to assert a breach of contract against the bank, and the arbitration clause that I discussed with Judge Gilman specifically provides that if it's a small amount, an amount that would ordinarily be thought of as one that was beyond or less than an amount that would be appropriate for a consumer to bring in an individual action can be brought into general sessions court. So the typical idea of contracts of adhesion also contemplates that there aren't similar services available elsewhere in the marketplace, and there is absolutely no proof in the record that these plaintiffs could not have gotten similar services elsewhere. They couldn't get 6.5% elsewhere, though, could they? May it please the court, there is absolutely no proof in the record that they could not. They came forward with absolutely no proof that they could not obtain similar terms at different banks, and the district court found this. I'm curious, what year would you say is the determinative year as to whether they could get similar interest rates? Is that the 2018 year when you changed the interest rate? Your Honor, that's a question I hadn't contemplated. At the time their original accounts were established, it was in the 18 to 20-year-ago timeframe. But wouldn't the test appropriately be the year that BB&T says, we're going to change your interest from 6.5% to something either 1% or 0.01%? There were two changes. January 2018, they changed it from 6.5% to 1.05%, and then April 2019, you changed it to 0.01%. You have two changes. I think Judge Moore is asking, do we look at 2018 or 2019, I guess. But I would think 2019, maybe.  I believe that would be correct, Your Honor. And then could we take judicial notice of what the interest rates are for various size accounts? I mean, I would think that that's public record as to what interest rates are for different kinds of financial instruments at a particular time. I don't believe anyone asked the district court to take judicial notice of any such interest rate. And we go back to the concept of who had the burden to come forward with some sort of proof to show that there were not similar services available in the marketplace. And that burden was on the plaintiffs in this case. And it's very similar, Judge Gilman, to the opinion that Your Honor wrote in Mazira that tells us that in order to avoid an arbitration clause, what would be expected is an unequivocal denial that the agreement had been made accompanied by supporting affidavits. And that's a quote that Your Honor made from a Third Circuit case called Parknett Mills. And in this case, we have no such proof from these plaintiffs that they did not agree, that they did not receive the arbitration agreements that were sent to them by BB&T. There's no proof that they didn't receive the arbitration agreements. And in fact, what the proof is, is that they acted by continuing to enjoy the benefit of their accounts for months and years after the arbitration clause was submitted to them. And I believe I'm out of time unless the court has questions for me. I have none. Thank you. Mr. Brown, I think you have your rebuttal. Yes, thank you. I do want to emphasize something that Judge Gilman pointed out, which is that the question is not merely one of forum, whether the plaintiffs in this case get to have their case heard by the district court in a jury versus an arbitrator, but that the arbitration agreement does include other restrictions, including a shifting of liabilities for attorney's fees and so on, which was never presented to them in a way that they could expressly manifest assent to or agreement to. Is that uncommon for arbitration agreements to allocate attorney fees, or is that more common? In the experience of a customer of this local bank, I would say that it's uncommon for them to be exposed to those agreements, period. How about banking arbitration agreements in general? I don't know. Is this outlier, or is this pretty standard? The only evidence before the trial court was the declaration of our banking expert from Sevier County, who said that arbitration agreements, period, were uncommon in Sevier County, even up through 2017. Okay, how about nationally? Is this the provisions that Judge Gilman were talking about, are those uncommon on a national basis to have such provisions in an arbitration contract with bank and their customers, or is this common? I don't know. Well, it's your burden, isn't it? If you're claiming that this is unconscionable, isn't it your burden to establish? It's their burden to prove the existence of an agreement to arbitrate. That's the bank's burden to prove that. Okay, I think they have, but now you're claiming that it's unconscionable, but you don't really have any evidence that the terms of the arbitration agreement are unconscionable, and I think, on the contrary, we would assume that they're valid and enforceable, and you say you didn't come up with any evidence to the contrary. Tennessee law on this point, under the Berzinski case that I mentioned earlier, says that adhesion contracts are unenforceable if they're beyond the reasonable expectations of an ordinary person, not a banking expert exposed to arbitration agreements in banking nationwide. If they're oppressive to the weaker party, which is the appellants in this situation, or if they serve to limit the obligations and liability of the stronger party, which is clearly BB&T, then they're not enforceable. What's your best case authority that the provisions of this bank arbitration agreement are unconscionable because of the oppressive terms that they allocate the burdens of attorney fees or fees or whatever you're talking about? What's your best authority anywhere? I think my favorite one is the Tennessee Supreme Court opinion, the Copeland decision that we've cited in our brief. In that case, the court referred to, approvingly cited, the Tennessee Court of Appeals case Smith v. People's Bank, where they looked at an exculpatory provision in a safe deposit box rental contract, and they said that it was unenforceable because it was regulated by statute and involved a service of great importance to the public. Banks hold themselves out as willing to perform service for any member of the public. Banks have greater bargaining power, and it was a standardized contract of adhesion, not open to negotiation. In this situation, the bank has argued extensively that the customers continue to take advantage of this account, continue to use it, but you have to keep in mind that these were maintenance accounts. No new deposits were allowed. By purportedly using these accounts, what the bank is referring to is inaction, the action of merely leaving their money in the account. That is perceived to be assent or argued to be assent by the bank, but in the eyes of Tennessee law, that is inaction, which, except in extreme circumstances, is not going to form a contract. There's no manifestation of assent. There has to be something other than mere inaction, unless there's an affirmative duty somewhere, which there's not in this case, for the customer to come forward and say, I agree or I disagree. You cannot impose that on them unilaterally, which is what the bank has tried to do here. Most importantly, Mr. Hicks referred to the Mazira decision, but it was the Mazira decision that said, where the court wrote, if a reasonable finder of fact could conclude that no valid agreement to arbitrate exists, the issue is subject to resolution by a jury. That pivots on the language in Title IX, Section 4 of the United States Code, where it says that a party may demand a jury trial of such issue if the making of the arbitration agreement is at issue. I think there's enough evidence here regarding whether these people agreed to it, that it should have been presented to a jury and was required to have done. Thank you both for your argument. The case will be submitted.